COMMONWEALTH vs. CRAIG A. CHARLTON.

No. 10-P-1042.

Plymouth. December 6, 2011. - February 16, 2012.

Present: KATZMANN, SMITH, & GRAINGER, JJ.

*Controlled Substances. Firearms. Evidence,* Constructive possession, Expert
opinion. *Constitutional Law,* Search and seizure, Confrontation of witnesses.
*Search and Seizure,* Consent. *Practice, Criminal,* Motion to suppress,
Confrontation of witnesses, Assistance of counsel, Argument by prosecutor.
*Witness,* Expert.

A Superior Court judge did not err in denying the criminal defendant's pretrial
    motion to suppress evidence retrieved from a search of an apartment,
    where the totality of the circumstances supported a finding that the defend-
    ant's consent to the search of the apartment was unfettered by coercion or
    duress. [297-299]
At the trial of indictments charging the defendant with, inter alia, possession
    of ammunition without a firearm identification card, the evidence was suf-
    ficient to prove that the defendant had constructive possession of the am-
    munition seized in the apartment where he was found, where, with respect
    to certain ammunition that was visible in a bureau drawer with its front
    missing, in the middle of the living room of the apartment, the defendant's
    presence in the apartment permitted the inference that he knew the box
    containing the ammunition was there; and where the evidence connecting
    the defendant to the apartment, and inferences drawn therefrom in the light
    most favorable to the Commonwealth, supported the conclusion that the
    defendant had the ability and intention to exercise dominion and control
    over the ammunition. [299-303]
At the trial of indictments charging the defendant with, inter alia, possession
    with intent to distribute cocaine, no violation of the defendant's right to
    confront witnesses against him arose from the testimony of a chemist, and
    any error arising from the admission in evidence of certificates of chemical
    analysis was harmless beyond a reasonable doubt. [303-304]
There was no merit to a criminal defendant's claim that his counsel at trial
    was ineffective. [304]
At a criminal trial, the prosecutor, in closing argument, did not misstate the
    law but, rather, argued a fair inference; moreover, the prosecutor did not
    err in stating that the defendant had "verified" his address when signing a
    booking sheet. [304-305]

INDICTMENTS found and returned in the Superior Court Depart-
ment on June 22, 2007.

A pretrial motion to suppress evidence was heard by *Jeffrey A. Locke,* J., and the cases were tried before *Elizabeth B. Donovan,* J.

*Sharon Dehmand* for the defendant.

*Peter Maguire,* Assistant District Attorney, for the Commonwealth.

KATZMANN, J. A Superior Court jury returned guilty verdicts on indictments charging possession with intent to distribute cocaine and possession of ammunition without a firearm identification (FID) card. After the jury were excused, the defendant pleaded guilty to so much of the ammunition indictment as alleged a prior violent offense. The defendant now appeals. The principal issue presented for review is whether the Commonwealth presented sufficient evidence to sustain a conviction based on constructive possession of the ammunition. The defendant also challenges the denial of his motion to suppress. We affirm the convictions.

*Background.* The jury could have found the following facts.[1] Shortly before midnight on April 17, 2007, Brockton police Officers Wilbur and Vargas responded to a report of a person shot at 46 Brett Street. At the side door to a two-family home, the officers were met by the defendant, who took them to the second-floor apartment. Wilbur described the apartment as being in "severe disarray." In the kitchen, through which Wilbur passed to get to the bedroom, there were three pit bulls in separate cages with fecal matter. In addition, empty food boxes were scattered on the floor with other trash, and furniture was upended and torn, with pieces missing.

The defendant led them to a bedroom where a young woman, later identified as Julie Ford, was lying on a bed with a gunshot wound to her abdomen. Paramedics arrived almost simultaneously and immediately began to treat Ford. At least five other officers also responded to the scene. Vargas did a quick sweep of the rest of the apartment to make sure no one was there with a gun and returned to the area near the bedroom.

Wilbur testified that while he was watching the paramedics

---

[1]Except where otherwise noted, the evidence and findings relevant to the motion to suppress were consistent with the trial evidence.

treat Ford, his attention was drawn to the defendant, who was also in the bedroom but appeared to be oddly focused on him, or something behind him, rather than the woman on the bed. Wilbur saw the defendant "attempt[] to move past [him] and put his hand towards the [dresser] drawer which was behind [Wilbur]." Wilbur grabbed the defendant, pushed him away from the drawer that was partly open, and looked inside. Expecting to find a gun, Wilbur was surprised to discover a plate holding both a razor blade and what he believed to be cocaine.

Wilbur escorted the defendant out of the bedroom and left him in the custody of other officers in the kitchen, while he returned to the bedroom to look around more carefully, particularly near the dresser area where he had just discovered the contraband. Wilbur saw boxes full of sandwich bags near the television set on the dresser and described them as "small ones that [he] generally see[s] people package drugs in." To the right side of the television were wrapped piles of primarily one hundred dollar and fifty dollar bills, later determined to total $4,750. Also nearby, there was another bag of what appeared to be cocaine, together with an electronic scale and a police radio scanner that was plugged in and operational.

During the protective sweep of the apartment, either Vargas or an assisting officer found a box of .25 caliber ammunition in a bureau drawer in the living room.[2] Wilbur testified that the bureau was in the middle of the room, with the front ripped off of it. The box of ammunition was in the exposed drawer.[3] The living room also contained a couch (that had been turned upside down), other pieces of broken furniture, and trash. Wilbur further testified that he found two bags of baking soda under the window in the living room.

---

[2]The trial evidence does not make clear whether the box of .25 caliber ammunition was found during the protective sweep or after the defendant consented to a search of the apartment. At the conclusion of the suppression hearing, however, the motion judge clearly found that the .25 caliber ammunition was found during the protective sweep. The defendant does not challenge this finding on appeal.

[3]The motion judge also ruled that this box of ammunition was found in plain view. The box was photographed before it was moved and the photographs were introduced at trial, but they have not been made part of the record on appeal. The defendant does not challenge the motion judge's conclusion that the evidence was in plain view.

The defendant was arrested in the apartment. While the defendant was still in the kitchen, Detective Delehoy sought and obtained his consent to search the apartment. Pursuant to that search, Delehoy found a box of ".357 Magnum hollow point ammunition" in a kitchen closet in a black bag.

At the police station, Officer Cole booked the defendant. Over objection, Cole testified that during the booking process, the defendant supplied his address as 46 Brett Street. That address was memorialized on the booking sheet that the defendant then signed and that was introduced in evidence. Wilbur testified that the gunshot victim told him that she was homeless, but during cross-examination he admitted that he did not interview her and that in another report prepared by Vargas, it stated that Ford had given her address as 46 Brett Street.

Annie Khan, a chemist with the Department of Public Health, explained the tests she performed on the substances that were seized during this incident and confirmed that the substances were cocaine.

Detective Thomas Keating testified as a drug expert. Based on all the items found in the apartment, he opined that the cocaine found therein was more consistent with distribution than personal use. He also testified that the fact that a razor blade was found on the plate with the contraband suggests it was being used to "cut" the purity of the cocaine with another substance like baking soda, or that the razor blade was used to wipe the product onto the scale to weigh it.

It was the defendant's theory of defense, presented through opening statement, cross-examination, and closing argument, that 46 Brett Street was a so-called "crack house" in which no one resided, that he was only present to help the woman who had been wounded, and that the evidence was insufficient to link him to the cocaine or the ammunition found in the apartment.

*Discussion.* 1. *Suppression motion.* Preliminarily, the defendant argues that the motion judge erred in denying his motion to suppress. He contends that the ammunition evidence retrieved from the kitchen closet should have been suppressed because the defendant's consent to search the apartment was involuntary. We disagree. After an evidentiary hearing, the motion judge found as follows:

"In fairly short order, the defendant was taken out of the bedroom and he was formally placed under arrest. He was advised of warnings pursuant to the Miranda decision. Detective Almeida provided the rights. He did that by reading the rights and . . . I find they were a complete set of warnings pursuant to Miranda . . . . As well, he informed [the defendant] that if he chose to answer questions, he could stop at any time. Detective Almeida also asked the defendant if he understood those warnings and the defendant indicated that he did.

"Following advising [the defendant] of Miranda warnings, Detective Almeida asked for permission to search the apartment. That is he said, can we search and the defendant responded in the affirmative. That is, he said 'Yeah, go ahead. You can get a warrant anyway, so you might as well search.' As a result of that, the officers looked in other areas. In particular, within the kitchen or off the kitchen was a closet and opening that closet door Detective Almeida observed a black cloth bag. In opening that bag, he found a box of .357 caliber ammunition. . . .

"[Regarding] whether or not the search of the kitchen closet was permissible and the seizure of ammunition from a black cloth bag[,] I find that it was permissible. It was based on the defendant's consent. I find the defendant gave his consent after being advised of Miranda warnings and by the manner in which he gave consent, indicated a knowledge that he had the right to refuse and the right to require the police to obtain a search warrant. Indeed he specifically stated that they could get a warrant anyway, so you might as well search. That evidences a knowledge of his rights and a voluntary waiver of his right to require the police to obtain a search warrant.

"I find that there is no evidence in this case that the police had threatened to obtain a warrant in order to induce the defendant's waiver or consent, rather I find that that consent was freely given and was voluntary. Accordingly, relying on the consent given, the police had a right to conduct a further search and that would include a right to search the closet and the cloth bag within the closet leading to the recovery of further ammunition, in this case .357 shells."

The motion judge's ultimate findings are entitled to substantial deference, and we accept his subsidiary findings where, as here, they are not clearly erroneous. See *Commonwealth* v. *Hilton,* 450 Mass. 173, 177-178 (2007). We apply constitutional principles independently. See *Commonwealth* v. *Bly,* 448 Mass. 473, 491 (2007). We see no reason to disturb the motion judge's determinations, and conclude that a totality of the circumstances supports a finding that there was consent unfettered by coercion. See *Commonwealth* v. *Rogers,* 444 Mass. 234, 237 (2005). The motion judge did not err in essentially concluding that after being read Miranda rights, the defendant consented to the search based on a pragmatic assessment of the circumstances, and not because of coercion or duress.

2. *Sufficiency of the evidence on ammunition charge.* Contending that the judge erroneously denied his motion for a required finding of not guilty, the defendant argues that the Commonwealth failed to present sufficient evidence to prove that he had constructive possession of the ammunition seized in the apartment where he was found.

"Proof of constructive possession requires the Commonwealth to show [1] knowledge coupled with the [2] ability and [3] intention to exercise dominion and control. Proof of possession . . . may be established by circumstantial evidence, and the inferences that can be drawn therefrom. Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense. While presence in an area where contraband is found alone cannot show the requisite knowledge, power, or intention to exercise control over the [contraband] . . . presence, supplemented by other incriminating evidence, will serve to tip the scale in favor of sufficiency." *Commonwealth* v. *Gonzalez,* 452 Mass. 142, 146 (2008) (citations and quotations omitted).

We review the question of sufficiency of the evidence under the oft-repeated *Latimore* standard, viewing the evidence in the light most favorable to the Commonwealth.[4] *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-678 (1979). See generally Smith,

[4]Putting aside the question of the admissibility of the chemist's expert testimony, which we discuss *infra,* there is properly no dispute that the evidence was sufficient to establish that the defendant possessed the cocaine with an

Criminal Practice & Procedure §§ 36.9-36.11 (3d ed. 2007 & Supp. 2011). At the outset, the Commonwealth must establish that the defendant knew the ammunition was in the apartment. With respect to the .25 caliber ammunition, the defendant's presence permitted the inference that he knew the box containing the ammunition was there because it was visible in the bureau drawer with the missing front, standing in the middle of the living room of the approximately four-room apartment. See *Commonwealth* v. *Montalvo*, 76 Mass. App. Ct. 319, 326-327 (2010) (evidence of defendant's knowledge of cocaine could be inferred because cocaine was plainly visible, but his knowledge of heroin could not be inferred because there was no evidence it was in view).

Somewhat thinner is the evidence of the defendant's knowledge of the .357 caliber ammunition found in a bag in the kitchen closet. The evidence tended to suggest that the defendant shared the apartment with the gunshot victim, but nothing was found in close proximity to the bag containing the .357 ammunition that provided a connection to the defendant.

Having determined that the defendant had knowledge of at least one of the two boxes of ammunition, we must consider whether the evidence was sufficient to show beyond a reasonable doubt that he had the ability and intent to exercise dominion and control over it. See *Commonwealth* v. *Delarosa*, 50 Mass. App. Ct. 623, 626-628 (2000); *Commonwealth* v. *Frongillo (No. 1)*, 66 Mass. App. Ct. 677, 682 (2006). The defendant and the Commonwealth present competing arguments and inferences. That a defendant provides as his address the place where contraband is found does not alone provide an ability and intent to control the contraband. See *Commonwealth* v. *Boria*, 440 Mass. 416, 421 (2003) (notwithstanding that defendant was linked to apartment by her welfare application and her statement that she lived there, "what the Commonwealth showed

---

intent to distribute it. The defendant's presence in the 46 Brett Street apartment (an apparent crack house) at the time the contraband was found, in conjunction with his attempt to hide the plate with the cocaine and the razor blade on it, clearly evinces that the defendant knew there was cocaine in the apartment and that he intended to exercise dominion and control over it. See generally *Commonwealth* v. *Delarosa*, 50 Mass. App. Ct. 623, 626-628 (2000); *Commonwealth* v. *Montalvo*, 76 Mass. App. Ct. 319, 326-327 (2010).

was only the defendant's presence where contraband was found, at most, allowing the reasonable inference of awareness"). Moreover, the defendant further urges that lacking here was evidence often used to connect a defendant to a location. The police had not been watching the defendant, nor had they seen him coming or going from the apartment. No testimony regarding personal papers, clothing, utility bills, or mail belonging to the defendant was offered, nor was there evidence the defendant had a key to the apartment, or that he paid the rent there. See and compare *Commonwealth* v. *Lee*, 2 Mass. App. Ct. 700, 704 (1974) (constructive possession of cocaine found in apartment supported by evidence that male defendant was seen coming and going from apartment and his personal papers were found therein as well as men's clothing); *Commonwealth* v. *Rarick*, 23 Mass. App. Ct. 912, 912 (1986) ("[C]ontraband was found in proximity to personal effects of the defendant in areas of the dwelling, such as a bedroom or closet, to which other evidence indicates the defendant has a particular relationship"); *Commonwealth* v. *Clarke*, 44 Mass. App. Ct. 502, 505-506 (1998) (birth certificate, Social Security card, and defendant's shirt kept in rear bedroom sufficient to support inference of constructive possession of contraband found there); *Commonwealth* v. *Delarosa*, 50 Mass. App. Ct. at 627 (evidence of possession of cocaine in apartment sufficient where defendant was seen coming and going from apartment; he had key to dwelling when stopped; rent receipts showed defendant's payment; and defendant had in his possession cocaine in bag that matched bags found in baseboard stash in apartment); *Commonwealth* v. *Farnsworth*, 76 Mass. App. Ct. 87, 99-100 (2010) (male defendant's time card, writings to him, men's clothing, men's boots, video game equipment, and room decor established "the defendant's knowledge, ability, and intention to exercise dominion and control over the area where the drugs were found").

Nor was any forensic testing undertaken that might connect the defendant to the ammunition, such as fingerprinting, deoxyribonucleic acid (DNA) testing, or testing that showed he recently fired a gun. See *Commonwealth* v. *Brown*, 50 Mass. App. Ct. 253, 257 (2000) (no direct evidence of firearm possession, "such as by observation, fingerprints, or paraffin tests").

In sum, the defendant has presented a number of arguments in support of his contention that there was an absence of evidence to support the inference that he had the intention and the ability to exercise dominion and control over the ammunition. However, in determining whether the Commonwealth has sustained its burden of overcoming a motion for a required finding, our role is not to weigh competing inferences.

> "In considering whether the jury could find the existence of each element of the crime charged, we do not weigh the supporting evidence against conflicting evidence. While the inferences drawn must be reasonable, they 'need not be necessary or inescapable.' That evidence is conflicting does not demand a required finding of not guilty. The jury are free to believe or disbelieve any or all of the evidence they hear. However, evidence is not sufficient if it requires piling 'inference upon inference,' or requires 'conjecture and speculation.' "

*Commonwealth* v. *Merry*, 453 Mass. 653, 660-661 (2009) (citations omitted). The appropriate question is, *taking the evidence in the light most favorable to the Commonwealth and drawing all inferences in favor of the Commonwealth*, was the evidence provided by the Commonwealth sufficient such that a rational juror could find guilt beyond a reasonable doubt? *Id.* at 660.

We conclude that here the Commonwealth has presented sufficient evidence, which need not be conclusive, to provide the necessary connection to the ammunition. First, the defendant did provide to the booking officer 46 Brett Street as his address.[5] A defendant's "residential status at a premises is a relevant inculpatory factor to be considered . . . , since it indicates

---

[5] We are unpersuaded by the defendant's argument that the booking sheet was improperly admitted as an adoptive admission. Merely because the defendant urged the jury to conclude at trial, and now repeats the claim on appeal, that he never told the booking officer that he lived at 46 Brett Street, the argument does not become fact. To the contrary, the booking officer testified that the defendant told him he lived at 46 Brett Street; that the booking officer recorded that address on the booking sheet; and that the defendant signed the booking sheet. The evidence regarding the defendant's address was properly admitted as an admission or adoptive admission, and there was no error. See generally *Commonwealth* v. *Marshall*, 434 Mass. 358, 365-366 (2001); *Commonwealth* v. *Shea*, 460 Mass. 163, 170-172 (2011); Mass. G. Evid. § 801(d)(2)(A), (B) (2011).

'more than mere presence.' " *Commonwealth* v. *Handy*, 30 Mass. App. Ct. 776, 781 n.5 (1991), quoting from *Commonwealth* v. *Arias*, 29 Mass. App. Ct. 613, 616 (1990), *S.C.*, 410 Mass. 1005 (1991). That the evidence suggested that 46 Brett Street was a crack house does not preclude the jury from also determining that the defendant lived there. In any event, our task on review is to defer to the inference that favors the Commonwealth's case. More significantly, the evidence supports a connection of the defendant to that address which is far stronger than mere presence. It was the defendant who assumed a proprietary role and waited at the bottom-floor side-door entrance of the two-family unit to meet the police when they arrived in response to a 911 call reporting the shooting. He then escorted them up to the second-floor apartment, taking them through the apartment to the bedroom where Ford lay wounded. It was the defendant, moreover, who, implying authority to do so, consented, without objection or qualification, to the search of the apartment. All of this evidence connecting the defendant to 46 Brett Street, and inferences drawn therefrom in the light most favorable to the Commonwealth, support the conclusion that the defendant had the ability and the intention to exercise dominion and control over the ammunition found there in plain view. That the defendant may have provided countervailing inferences does not upset our calculus, for our charge is to view the evidence in the light most favorable to the Commonwealth. See Smith, Criminal Practice & Procedure § 36.11, at 16 (3d ed. 2007) ("To the extent that conflicting inferences are possible from the evidence, it is for the jury to determine where the truth lies"). "The fact that the evidence did not require the jury to draw the inference [of guilt] does not preclude the conclusion [that the motions for directed verdicts were properly denied]. It is sufficient that the evidence permitted the inference which the jury obviously drew . . . ." *Commonwealth* v. *Latimore*, 378 Mass. at 678-679, quoting from *Commonwealth* v. *Nelson*, 370 Mass. 192, 203 (1976). We therefore uphold the conviction of possession of ammunition without an FID card.[6]

3. *Other issues.* a. *Expert testimony and confrontation clause.* The defendant contends that the chemist and expert witness in

_____

[6]In a supplemental memorandum of law the defendant contends that the

this case, Annie Khan, improperly testified to hearsay evidence that violated his confrontation rights. We agree with the Commonwealth that Kahn limited her testimony to the tests she actually performed and the results she obtained, and there was no violation of the confrontation clause where Khan did not proffer any opinions reached by the initial or so-called primary chemist. See *Commonwealth* v. *Nardi*, 452 Mass. 379, 387-391 (2008); *Commonwealth* v. *Durand*, 457 Mass. 574, 584-585 (2010); *Commonwealth* v. *Barbosa*, 457 Mass. 773, 780-791 (2010), cert. denied, 131 S. Ct. 2441 (2011); *Commonwealth* v. *Munoz*, 461 Mass. 126, 130-138 (2011); *Commonwealth* v. *Mc-Grail*, 80 Mass. App. Ct. 339, 341-345 (2011). To the extent that it was error to permit the certificates of chemical analysis to be submitted to the jury with the primary chemist's signature as well as Khan's signature, the error was harmless beyond a reasonable doubt.[7]

b. *Ineffective assistance of counsel.* Even assuming, arguendo, that Officer Wilbur gave an improper opinion that the baggies he found in the bedroom looked like the kind used in the drug trade, the lack of an objection did not "likely deprive[] the defendant of an otherwise available, substantial ground of defence," *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), where the testimony proffered by the police drug expert, Detective Keating, mirrored Wilbur's statement and was properly admitted.

c. *Closing argument.* The defendant argues for the first time on appeal that the prosecutor misstated the law when he told the

___

evidence is insufficient to sustain the ammunition charge because the Commonwealth failed to prove that the defendant did not have an FID card, as the Commonwealth may not rely on the rebuttable presumption of G. L. c. 278, § 7, because it is unconstitutional. This argument is precluded by *Commonwealth* v. *Powell*, 459 Mass. 572, 582 (2011), which was not altered by *Commonwealth* v. *Loadholt*, 460 Mass. 723, 727 (2011).

[7]Insofar as the defendant now appears to contend that there is a chain of custody question regarding the route of the contraband from the police to the primary expert and then to Khan as the confirmatory expert, we would note that the issue was not squarely so presented to the judge. In any event, Khan testified as to standard chain of custody procedures, and on cross-examination acknowledged that the chemists relied on "evidence coming into you by the police departments." Any alleged weakness in the chain of custody went to the weight and not to the admissibility of the evidence. See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 230 (1992).

jury that the defendant "trie[d] to sneak around and hide those [drug] items. Does that mean he knew they were there and he controlled them? Of course. That's that exact legal definition of possession." In context, it is clear that the prosecutor was arguing a fair inference, namely that the defendant's behavior supported the conclusion that he knew the drugs were there and that he had the ability and intention to exercise dominion and control over them. There was no error.

Nor was there any error when the prosecutor argued, without objection, that the defendant "verified" his address when he signed the booking sheet. While the term "verify" may have a formal legal definition, it also has an informal meaning, "to confirm or establish the authenticity or existence of by examination." Webster's Third New Intl. Dictionary 2543 (1993). In the latter sense, the prosecutor's argument was proper.

*Conclusion.* None of the alleged errors to which the defendant points requires relief. The motion judge did not err in denying the defendant's motion to suppress and no reversible error has been shown on the part of the trial judge, defense counsel, or the prosecutor.

*Judgments affirmed.*